**David Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Dallas DeLuca, OSB #072992**
DallasDeluca@MarkowitzHerbold.com
**Stanton R. Gallegos, OSB #160091**
StantonGallegos@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR  97201
Tel:  (503) 295-3085

> Attorneys for Defendants
> (Additional counsel of record listed on signature page)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| In re Portland General Electric Company Securities Litigation | Case No.: 3:20-cv-1583-SI<br><br>**Defendants'**<br>**MOTION TO DISMISS**<br>**Pursuant to Fed. R. Civ. P. 9(b), 12(b)(6) and Section 21D(b)(1) of the Private Securities Litigation Reform Act of 1995**<br><br>**Request for Oral Argument** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

LOCAL RULE 7-1 CERTIFICATION ..................................................................................1

MOTION..................................................................................................................................1

MEMORANDUM OF LAW ...................................................................................................1

I.     PRELIMINARY STATEMENT ................................................................................1

II.    BACKGROUND ..........................................................................................................6

       A.    PGE's business is to serve retail customers. ..................................................6

       B.    PGE discloses that it engages in physical and financial energy
             transactions. ......................................................................................................6

       C.    PGE discloses that its customer prices are determined through a regulatory
             process and that financial derivative transactions contribute to prices..................7

       D.    PGE discloses the risks relating to its energy trading.............................................8

       E.    PGE experiences unforeseen trading losses and promptly reviews its
             trading practices. ...............................................................................................9

III.   THE AC SHOULD BE DISMISSED WITH PREJUDICE .............................................10

       A.    Plaintiff does not plead any material misstatements or omissions. ......................11

             1.    Plaintiff fails to plead that PGE's statements about not trading for
                   "Non-Retail Purposes" were false................................................................11

                   (a)    Plaintiff's definition of "Non-Retail Purposes" is
                          unsupported and one of its own making. .......................................11

                   (b)    PGE's disclosures contradict Plaintiff's claim of falsity. ..............13

                   (c)    PGE's decision not to pass the trading losses to customers
                          does not support Plaintiff's theory of falsity. ................................15

                   (d)    Plaintiff's allegation that PGE participates in "wholesale"
                          trading is irrelevant and insufficient to show falsity....................16

             2.    Plaintiff fails to plead that PGE's statements about "Balancing
                   Supply" and "Managing Risk" were false....................................................17

**Page i – DEFENDANTS' MOTION TO DISMISS**

3.      Plaintiff fails to plead that earnings-related statements were misleading. ..............................................................................18

4.      Plaintiff fails to plead that PGE's general statements regarding cost, risk, and strategy were false. .............................................20

5.      Plaintiff fails to plead that Sarbanes-Oxley certifications were false. ...........................................................................................21

6.      Plaintiff's general allegations of mismanagement are insufficient. ..........21

B.      The AC fails to allege a strong inference of scienter as to each Defendant. .........22

1.      Plaintiff's scienter allegations as to the Individual Defendants are insufficient. ..................................................................................22

(a)     Plaintiff does not allege that the Individual Defendants had specific information contrary to the challenged disclosures..........23

(b)     Plaintiff's allegations regarding the Individual Defendants' compensation are insufficient. ........................................26

(c)     Plaintiff's allegations regarding Mr. Lobdell's retirement are insufficient. ............................................................26

(d)     Plaintiff cannot rely on the "core operations" doctrine.................27

2.      Plaintiff's confidential witness allegations fail to establish scienter.........28

3.      Plaintiff does not plead any cogent motive to commit fraud. ...................32

4.      Plaintiff's allegations support a more compelling inference of non-fraud. ........................................................................................33

C.      Plaintiff does not plead loss causation. ...............................................................34

IV.     PLAINTIFF DOES NOT STATE A CLAIM UNDER SECTION 20(A) OF THE EXCHANGE ACT...............................................................................................36

V.      CONCLUSION......................................................................................................36

CERTIFICATE OF COMPLIANCE ................................................................................38

## TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Autodesk, Inc. Securities Litigation*,
    132 F. Supp. 2d 833 (N.D. Cal. 2000) ...............................................................24

*Brodsky v. Yahoo! Inc.*,
    592 F. Supp. 2d 1192 (N.D. Cal. 2008) ...........................................................11

*Bruce v. Suntech Power Holdings Co.*,
    2013 WL 6843610 (N.D. Cal. Dec. 26, 2013).....................................................21

*California Public Employees' Retirement System v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)..................................................................................6

*Christian v. BT Group PLC*,
    2020 WL 1969941 (D.N.J. Apr. 24, 2020), *appeal docketed sub nom. PAMCAH-
    AU Local 675 Pension FU v. BT Group PLC*, No. 20-2106 (3d Cir. June 2, 2020) ........26

*City of Roseville Employees' Retirement System v. Horizon Lines, Inc.*,
    713 F. Supp. 2d 378 (D. Del. 2010) , *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ..................26

*City of Royal Oak Retirement System v. Juniper Networks, Inc.*,
    2013 WL 2156358 (N.D. Cal. May 17, 2013)....................................................14

*In re Dothill Systems Corp. Securities Litigation*,
    2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ......................................................21

*In re Downey Securities Litigation*,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)....................................................32

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005)...............................................................................................5

*Feola v. Cameron*,
    2015 WL 12644566 (C.D. Cal. Nov. 24, 2015)..................................................27

*FERC v. Barclays Bank PLC*,
    105 F. Supp. 3d 1121 (E.D. Cal. 2015)............................................................6, 7

*Glazer Capital Management, L.P. v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) .............................................................22, 24, 25, 32

*Howard v. Arconic Inc.*,
    395 F. Supp. 3d 516 (W.D. Pa. 2019)..................................................................2

*In re Impac Mortgage Holdings, Inc. Securities Litigation*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ........................................21

*In re Intrexon Corp. Securities Litigation*,
    2017 WL 732952 (N.D. Cal. Feb. 24, 2017) ..............................19

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
    2021 WL 796336 (N.D. Cal Mar. 2, 2021)..............................28, 30

*Kaplan v. Charlier*,
    426 F. App'x 547 (9th Cir. 2011)................................................22

*In re LifeLock, Inc. Securities Litigation*,
    690 F. App'x 947 (9th Cir. 2017)...........................................22, 34

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ..............................................23, 36

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) .....................................................34

*Mahapatra v. Truecar, Inc.*,
    2015 WL 12552062 (C.D. Cal. Dec. 9, 2015) ............................23

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd sub nom. Fresno County Employees'*
    *Retirement Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) .........20, 27

*Mandalevy v. Bofl Holding, Inc.*,
    2018 WL 3032588 (S.D. Cal. June 19, 2018).............................19

*Melot v. JAKKS Pacific, Inc.*,
    2014 WL 12589334 (C.D. Cal. June 6, 2014) ............................19

*Melot v. JAKKS Pacific, Inc.*,
    2016 WL 6902093 (C.D. Cal. Nov. 18, 2016).............................35

*Metzler Asset Management GmbH v. Kingsley*,
    928 F.3d 151 (1st Cir. 2019)......................................................29

*Metzler Investment GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ........................................... passim

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ...........................................29, 30, 33

**Page iv – DEFENDANTS' MOTION TO DISMISS**

*Nietzche v. Freedom Home Mortgage Corp.*,
  2019 WL 5057174 (D. Or. Oct. 8, 2019), *appeal docketed*, No. 19-35876 (9th Cir.
  Oct. 17, 2019) .........................................................................................................25

*Nozak v. Northern Dynasty Minerals Ltd.*,
  804 F. App'x 732 (9th Cir. 2020).........................................................................29

*In re NVIDIA Corp. Securities Litigation*,
  768 F.3d 1046 (9th Cir. 2014) .......................................................22, 29, 30, 31

*Oklahoma Firefighters Pension & Retirement System v. Ixia*,
  2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ..................................................28

*Police & Fire Retirement System of Detroit v. Plains All American Pipeline, L.P.*,
  777 F. App'x 726 (5th Cir. 2019) .........................................................................2

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) .................................................................4, 23, 24, 27

*In re ProShares Trust Securities Litigation*,
  728 F.3d 96 (2d Cir. 2013)...................................................................................13

*Reidinger v. Zendesk, Inc.*,
  2020 WL 6562335 (N.D. Cal. Nov. 9, 2020) ......................................................2

*Retail Wholesale & Department Store Union Local 338 Retirement Fund v.
  Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ............................................................................11

*Retirement Board of Policemen's Annuity & Benefit Fund of Chicago ex rel. Policemen's
  Annuity & Benefit Fund of Chicago v. FXCM Inc.*,
  333 F. Supp. 3d 338 (S.D.N.Y. 2018), *aff'd*, 767 F. App'x 139 (2d Cir. 2019)..........13, 24

*In re Rigel Pharmaceuticals, Inc. Securities Litigation*,
  697 F.3d 869 (9th Cir. 2012) ..............................................................................32

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ..............................................................................11

*Roofers Local No. 149 Pension Fund v. DreamWorks Animation SKG, Inc.*,
  677 F. App'x 376 (9th Cir. 2017)........................................................................35

*In re Sanofi Securities Litigation*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016).................................................................33

*Santa Fe Industries Inc. v. Green*,
  430 U.S. 462 (1977)..............................................................................................22

**Page v – DEFENDANTS' MOTION TO DISMISS**

*In re Seadrill Ltd. Securities Litigation*,
  2016 WL 3461311 (S.D.N.Y. June 20, 2016) ...................................................33

*Sharenow v. Impac Mortgage Holdings, Inc.*,
  385 F. App'x 714 (9th Cir. 2010).....................................................................34

*In re Shoretel Inc. Securities Litigation*,
  2009 WL 248326 (N.D. Cal. Feb. 2, 2009) .....................................................35

*Short v. Dondanville*,
  2012 WL 12888360 (C.D. Cal. Oct. 5, 2012)..................................................20

*In re Silicon Graphics Inc. Securities Litigation*,
  183 F.3d 970 (9th Cir. 1999) ...........................................................................15

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019).................................................................................2

*Slayton v. American Express Co.*,
  604 F.3d 758 (2d Cir. 2010)............................................................................33

*In re Solarcity Corp. Securities Litigation*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) .............................................................18

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008).........................................................................................10

*Tellabs, Inc. v. Makor Issuers & Rights, Ltd.*,
  551 U.S. 308 (2007).........................................................................3, 6, 22, 33

*In re Tibco Software, Inc.*,
  2006 WL 1469654 (N.D. Cal. May 25, 2006) .................................................32

*In re Verifone Securities Litigation*,
  2016 WL 1213666 (N.D. Cal. Mar. 29, 2016).................................................35

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ...............................................................19

*Westchester Teamsters Pension Fund v. UBS AG*,
  604 F. App'x 5 (2d Cir. 2015)..........................................................................33

*Western Pennsylvania Electrical Employees Pension Fund v. Mentor Graphics Corp.*,
  2017 WL 3668957 (D. Or. June 2, 2017) ........................................................19

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .....................................................................3, 12

**Page vi – DEFENDANTS' MOTION TO DISMISS**

*Xu v. ChinaCache International Holdings Ltd.*,
 2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ........................................................13, 20, 21

*Zucco Partners, LLC v. Digimarc Corp.*,
 445 F. Supp. 2d 1201 (D. Or. 2006), *aff'd*, 552 F.3d 981 (9th Cir. 2009),
 *as amended* (Feb. 10, 2009) ...................................................................................30

*Zucco Partners, LLC v. Digimarc Corp.*,
 552 F.3d 981 (9th Cir. 2009) ............................................................................ passim

## STATUTES

15 U.S.C. § 78u-4(b)(1) .................................................................................................3

15 U.S.C. § 78u-4(b)(2) .................................................................................................3

## RULES

Fed. R. Civ. P. 9(b) .......................................................................................................1

Fed. R. Civ. P. 12(b)(6) .................................................................................................1

## OTHER AUTHORITIES

John C. Coffee Jr., *Event-Driven Securities Litigation: Its Rise and Partial Fall*,
 N.Y.L.J. (Mar. 20, 2019) ..........................................................................................2

## LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7-1, counsel for Portland General Electric Company ("PGE" or the "Company"), Maria Pope and James Lobdell (the "Individual Defendants" and with PGE, "Defendants") made a good faith effort to confer with counsel for lead plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff") but were unable to resolve the issues in this motion.

## MOTION

Defendants hereby move, pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and Section 21D(b)(1) of the Private Securities Litigation Reform Act of 1995, to dismiss the Amended Consolidated Class Action Complaint (ECF No. 26 ("AC")) with prejudice. Defendants submit herewith a supporting memorandum of law, motion for judicial notice and supporting memorandum, and the two declarations of Dallas DeLuca with the exhibits and the Appendix A to this motion.

## MEMORANDUM OF LAW

## I.  PRELIMINARY STATEMENT

The AC is emblematic of an all-too-common and unfortunate trend in securities litigation: the plaintiff highlights a negative event in the life of a corporation, points to a stock price decline, and claims—in conclusory and hindsight fashion—that "fraud" must have been the cause. Courts around the country have grappled with this type of "event-driven litigation," and routinely dismiss complaints that, like here, opportunistically attempt to use the federal securities

**Page 1 – DEFENDANTS' MOTION TO DISMISS**

laws in ways those statutes were never intended.[1]

Defendant PGE is an Oregon-based, regulated electric utility company. (AC ¶27.) In August 2020, the western United States experienced an unprecedented heat wave, resulting in California's first rolling black-outs since 2001. (*Infra* §II.E.) Ten days later, PGE disclosed that it expected to incur energy trading losses of approximately $127 million due to a spike in prices "at various market hubs due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West." (Ex. 6 at 3 (8/24/2020 8-K).) PGE also disclosed that it promptly formed an independent Special Committee, advised by the Committee's own legal advisors, to investigate the trading activity that led to the losses and to review PGE's trading procedures and controls.

Seeking to capitalize on these events, the AC seizes upon the drop in PGE's stock price following the announcement, recites snippets from PGE's past disclosures, and asserts in conclusory fashion that PGE's trading losses revealed a scheme to defraud investors. This strategy does not survive scrutiny under the stringent standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). As the Supreme Court has emphasized, Congress enacted the PSLRA to curb speculative lawsuits that "can be employed abusively to impose

---

[1] *See, e.g.*, *Singh v. Cigna Corp.*, 918 F.3d 57, 60 (2d Cir. 2019) (affirming dismissal of claims based on announcement of regulatory violations); *Police & Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 728-29 (5th Cir. 2019) (affirming dismissal of claims precipitated by an off-shore oil spill); *Reidinger v. Zendesk, Inc.*, 2020 WL 6562335, at *11-12 (N.D. Cal. Nov. 9, 2020) (dismissing claims based on disclosure of a previously undetected data breach); *Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 535 (W.D. Pa. 2019) (dismissing claims brought following a fire in a high-rise apartment); *see also* John C. Coffee Jr., *Event-Driven Securities Litigation: Its Rise and Partial Fall*, N.Y.L.J. (Mar. 20, 2019) ("We are . . . beginning to see the courts confront (with skepticism) this new pattern of event-driven securities litigation.").

**Page 2 – DEFENDANTS' MOTION TO DISMISS**

substantial costs on companies and individuals." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). Pursuant to the PSLRA, a securities plaintiff must therefore "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference" that each defendant acted with scienter (*i.e.*, an intent to defraud). 15 U.S.C. § 78u-4(b)(1), (2). Far from meeting these standards, the AC pleads facts that, when viewed collectively, paint a compelling picture of Defendants' *non*-fraudulent conduct. The AC thus should be dismissed with prejudice for the following reasons:

*First*, Plaintiff fails to allege that any Defendant made a materially false or misleading statement. (*Infra* §III.A.) The AC merely points to the trading losses in August 2020 and claims that such losses are due to fraud because PGE previously disclosed that it does not engage in trading "for non-retail purposes." Yet Plaintiff does not offer any facts (let alone particularized ones) to show why this disclosure was false. The AC does not identify any particular transaction that was a "non-retail" trade. Instead, Plaintiff posits without support that the Company's statement meant that its energy trading would not be "risky." But Plaintiff's invented definition of "non-retail purpose" is found nowhere in PGE's public disclosures. The Ninth Circuit recently rejected such an attempt to rewrite disclosures to suit a shareholder plaintiff's purpose. *Wochos v. Tesla Inc.*, 985 F.3d 1180, 1193-94 (9th Cir. 2021).

What PGE's disclosures *do* explain is that (i) PGE is exposed to price risk—*i.e.*, risk resulting from an increase or decrease in the price of energy, which affects PGE's retail customer pricing; (ii) the Company engages in financial derivative energy trading to attempt to manage those risks; and (iii) the gains and losses from such trading are accounted for through a specific regulatory mechanism that contributes to and determines retail customer pricing. (*Infra* §II.B-D.)

**Page 3 – DEFENDANTS' MOTION TO DISMISS**

Plaintiff expressly concedes that such financial trading activities carry risk (AC ¶44), and otherwise alleges no facts to show that the trading at issue fell outside these publicly disclosed criteria.

The AC also challenges PGE's statements about its financial results; certifications that the Individual Defendants had identified no material weaknesses in controls over financial reporting; and various statements about PGE's general corporate strategy (all generalized allegations that courts regularly dismiss). But again, Plaintiff fails to plead any facts showing how these statements were false or misleading based on the trading losses that occurred. Accordingly, they fail as a matter of well-settled law. (*Infra* §§III.A(3)-(5).)

*Second*, Plaintiff does not plead that any Defendant had an intent to defraud PGE shareholders. Under the PSLRA, Plaintiff must allege particularized facts evincing a strong inference of scienter that is cogent and at least as compelling as any non-fraudulent inference. (*Infra* §III.B.) Specifically, Plaintiff must (i) allege "specific information conveyed to management and related to the fraud," *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008), or (ii) show that this is among the "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citation omitted). The AC does not identify a single internal report, document, communication, or any other information to show that any Defendant knew the Company's trading activities somehow rendered its public disclosures false at the time they were made. Rather, Plaintiff resorts to the often-rejected theory that the Individual Defendant *must have* known the challenged statements were false based on their positions at the Company. Courts routinely hold such pleading tactics are insufficient under the

**Page 4 – DEFENDANTS' MOTION TO DISMISS**

PSLRA. (*Infra* §III.B.1(a).)

Although Plaintiff offers vague statements from four purported "confidential witnesses," these allegations add nothing to scienter. Indeed, the AC fails to allege any facts to show that these witnesses—none of whom were PGE traders, supervised traders, or oversaw the Company's disclosure function—have reliable, personal knowledge about PGE's trading practices or how they rendered PGE's public disclosures false.

Moreover, Plaintiff fails to articulate any cogent and compelling motive for the Individual Defendants to engage in securities fraud. The AC does not plead that they received any personal benefit from the purported scheme, such as through sales of personally held PGE stock. Instead, the facts alleged reflect not only a plausible non-culpable explanation for the alleged conduct, but the *only* cogent one: that PGE suffered losses based on a confluence of unanticipated events and acted promptly to apprise the public and form an independent Special Committee to review potential issues. These facts describe non-fraudulent conduct that fatally undermines Plaintiff's theory of fraud. (*Infra* §III.B.3.)

*Finally*, Plaintiff fails to plead that PGE's alleged misrepresentations actually "caused the loss" for which it seeks to recover, as it must. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-46 (2005); (*Infra* §III.C.) The alleged corrective disclosure—the announcement of trading losses on August 24, 2020—says nothing about the purpose of the trades at issue, including whether they were "risky" or "speculative" as Plaintiff now claims. Additionally, the AC alleges that PGE had previously disclosed that it engaged in trading for "non-retail purposes" as early as February 2020 (AC ¶¶86-87)—more than six months *before* the close of the Class Period. Crediting

**Page 5 – DEFENDANTS' MOTION TO DISMISS**

Plaintiff's own allegations then, the revelation of the purported fraud did *not* occur on August 24, 2020—the sole alleged date of Plaintiff's losses—thus defeating any allegation of loss causation.[2]

At bottom, the AC is precisely the type of pleading that Congress sought to discourage when it enacted the PSLRA. *Tellabs*, 551 U.S. at 313. Merely "[c]obbling together a litany of inadequate allegations does not render those allegations particularized in accordance with Rule 9(b) or the PSLRA." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 155 (3d Cir. 2004). For the reasons herein, the Court should dismiss the AC with prejudice.

## II.    BACKGROUND

### A.    PGE's business is to serve retail customers.

PGE generates revenue primarily through the sale and delivery of electricity to its retail customers. (AC ¶29; Ex. 3 at 8 (2019 10-K).) To meet the needs of retail customers, PGE (i) generates power through company-owned facilities, and (ii) purchases and sells electricity through bilateral agreements and in the wholesale energy markets. (AC ¶30; Ex. 3 at 5, 10 (2019 10-K).)

### B.    PGE discloses that it engages in physical and financial energy transactions.

As PGE disclosed throughout the Class Period, it enters into both physical and financial power transactions in wholesale energy markets (*i.e.*, to buyers and sellers other than retail customers) in the western United States. (Ex. 3 at 10 (2019 10-K).) "Physical products involve[] the obligation to deliver or receive physical electricity at a particular location during a particular time." *FERC v. Barclays Bank PLC*, 105 F. Supp. 3d 1121, 1125 (E.D. Cal. 2015). Financial

---

[2] The AC also fails to adequately allege control person liability under Section 20(a) against the Individual Defendants. (*Infra* §IV.)

positions, on the other hand, "[do] not entail physical obligations to deliver or receive electricity"

but rather are "settled through an exchange of payments." *Id.* at 1126. As PGE explained, it

enters into physical power transactions to meet the needs of retail customers. (Ex. 3 at 10 (2019

10-K).)

PGE further explained that it enters into financial derivative transactions to manage

"price risk"—the risk resulting from an increase or decrease in the price of energy. (AC ¶110;

Ex. 3 at 54 (2019 10-K).) PGE disclosed that these financial transactions took various forms,

including:

> i) forward contracts, which may involve physical delivery of an energy
> commodity; ii) financial swap and futures agreements, which may require
> payments to, or receipt of payments from, counterparties based on the differential
> between a fixed and variable price for the commodity; and iii) option contracts to
> mitigate risk that arises from market fluctuations of commodity prices.

(Ex. 3 at 54 (2019 10-K); *see also* Ex. 4 at 56 (Q1 10-Q); Ex. 5 at 58 (Q2 10-Q).)

## C.  PGE discloses that its customer prices are determined through a regulatory process and that financial derivative transactions contribute to prices.

PGE's principal regulator is the Public Utility Commission of Oregon ("PUC"). (AC

¶15.) The PUC approves the rates PGE may charge customers. (Ex. 3 at 6-7 (2019 10-K).) As

part of this process, the PUC evaluates on an annual basis PGE's forecasted power costs and

approves a "baseline" Net Variable Power Cost ("Power Cost") for the following year. (*Id.* at 7.)

The Power Cost that PGE forecasts consists of two variables: (1) PGE's cost of power purchased

and fuel used to generate electricity, and (2) PGE's "cost of settled electric and natural gas

financial contracts." (*Id.*)[3] Retail rates approved by the PUC therefore reflect PGE's physical and

---

[3] These variables are net of wholesale revenues. (*Id.*)

**Page 7 – DEFENDANTS' MOTION TO DISMISS**

financial derivative transactions.

In years where the *actual* Power Cost exceeds the *forecasted* baseline Power Cost by certain thresholds, the PUC applies a regulatory framework known as the Power Cost Adjustment Mechanism ("Cost Adjustment Mechanism" or "PCAM") to adjust the price PGE may charge customers. (*Id.* at 65.) Under the Cost Adjustment Mechanism, when the actual Power Cost is less than the forecast, PGE is required to refund a portion of those savings to customers. (*Id.*) Conversely, when the Power Cost exceeds the forecast, PGE must absorb a portion of the costs but can apply to the PUC to share the remaining portion with customers. (AC ¶83; Ex. 3 at 71 (2019 10-K).) Because its financial derivative transactions are included in the Power Cost calculations (as PGE disclosed), these transactions are designed to benefit PGE's retail customers. (Ex. 3 at 71 (2019 10-K).)

**D.    PGE discloses the risks relating to its energy trading.**

Throughout the Class Period, PGE also disclosed the risks associated with its trading in the wholesale energy and derivatives market. For example, PGE warned that:

- "Market prices for power and natural gas are subject to forces that are often not predictable and that can result in price volatility and general market disruption, adversely affecting PGE's costs and ability to manage its energy portfolio";

- "Disruption in power and natural gas markets could result in a deterioration of market liquidity . . . affect wholesale power prices, and impair PGE's ability to manage its energy portfolio"; and

- "Changes in power and natural gas prices can also affect the fair value of derivative instruments and cash requirements to purchase power and natural gas. . . . [I]f power and natural gas prices rise, especially during periods when the Company requires greater-than-expected volumes that must be purchased at market or short-term prices, PGE could incur greater costs than originally estimated."

(Ex. 3 at 21 (2019 10-K); *see also* Ex. 4 at 57 (Q1 10-Q); Ex. 5 at 59 (Q2 10-Q).) PGE further

**Page 8 – DEFENDANTS' MOTION TO DISMISS**

disclosed that unforeseen weather conditions—like those associated with the trading losses at issue in this case—could increase power prices and PGE's costs:

- "Weather conditions can adversely affect PGE's revenues and costs, impacting the Company's results of operations"; and

- "Rapid increases in load requirements resulting from unexpected adverse weather changes, particularly if coupled with transmission constraints, could adversely impact PGE's cost and ability to meet the energy needs of its customers."

(Ex. 3 at 22 (2019 10-K); *see also* Ex. 4 at 57 (Q1 10-Q); Ex. 5 at 59 (Q2 10-Q).)

Finally, PGE warned investors that the Cost Adjustment Mechanism might not fully protect investors from these risks. (Ex. 3 at 21 (2019 10-K).) PGE told investors that if cost management activities resulted in imprudent transactions, including transactions resulting in "increased operational risks," it may not pass costs to customers under the Cost Adjustment Mechanism. (Ex. 3 at 21 (2019 10-K); *see also* Ex. 4 at 57 (Q1 10-Q); Ex. 5 at 59 (Q2 10-Q).)

**E.    PGE experiences unforeseen trading losses and promptly reviews its trading practices.**

In August 2020, the western United States experienced an unforeseen, extreme heat wave.[4] This resulted in California's first rolling black-outs since 2001, and an unprecedented spike in electricity prices. (AC ¶91; Ex. 6 at 3 (8/24/2020 8-K).) Ten days later, PGE disclosed that it sustained estimated losses of $127 million due to energy trading in certain electricity markets. (*Id.*) PGE explained that traders had entered into "a number of energy trades during 2020, with increasing volume accumulating late in the second quarter and into the third quarter." (Ex. 6 at 3 (8/24/2020 8-K).) "In August 2020, this portion of PGE's energy portfolio

---

[4]    (Ex. 10 at 51-52 (Cal. Indep. Sys. Operator, Cal. Pub. Utils. Comm'n & Cal. Energy Comm'n, Final Root Cause Analysis: Mid-August 2020 Extreme Heat Wave (Jan. 13, 2021)).)

**Page 9 – DEFENDANTS' MOTION TO DISMISS**

experienced significant losses as wholesale electricity prices increased substantially at various market hubs due to extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West." (*Id*.) PGE also announced that it would not seek to pass these losses on to customers through the Cost Adjustment Mechanism, and that it was taking immediate steps to review the trading that led to the losses. (AC ¶¶82, 92; Ex. 6 at 4 (8/24/2020 8-K).) As a result, PGE's Board of Directors appointed an independent Special Committee, which retained its own outside counsel, to review the trading losses. (AC ¶92.)

On December 18, 2020, PGE issued a press release disclosing that the Special Committee had completed its review and concluded that the onset of "extreme weather conditions, constraints to regional transmission facilities, and changes in power supply in the West" caused significant market disruptions, which caused PGE's energy portfolio to realize the losses at issue. (AC ¶¶98, 101.) Although the Special Committee noted that PGE had begun taking actions "to enhance oversight of energy trading" (*id.* ¶99), the disclosure did not, as Plaintiff alleges, state that the trades "resulted from flaws in PGE's risk management controls." (*Id.* ¶11; *see* Ex. 7 (12/18/2020 8-K).)

## III.    <u>THE AC SHOULD BE DISMISSED WITH PREJUDICE</u>

The pleading standards for securities fraud claims require that a complaint meet the heightened pleading standards of the PSLRA and Rule 9(b). *Metzler*, 540 F.3d at 1061. To state a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), a plaintiff must allege, among other things, particularized facts that each defendant (i) made a misstatement or omission of material fact, (ii) with scienter, and (iii) that caused the plaintiff's loss. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). Plaintiff fails to allege any of these elements.

Page 10 – DEFENDANTS' MOTION TO DISMISS

**A.      Plaintiff does not plead any material misstatements or omissions.**

"The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler*, 540 F.3d at 1069.

Plaintiff must "allege a misrepresentation or a misleading omission with particularity and explain

why it is misleading." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-*

*Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017). To meet this standard, "the complaint must

contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the

intentional or the deliberately reckless false or misleading nature of the statements when made."

*Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).

**1.      Plaintiff fails to plead that PGE's statements about not trading for "Non-Retail Purposes" were false.**

**(a)      Plaintiff's definition of "Non-Retail Purposes" is unsupported and one of its own making.**

First, Plaintiff relies on a pleading tactic that courts have rejected: it singles out a

statement in the Company's disclosures and asserts, without basis, that it must be false based on

subsequent events (here, PGE's unforeseen trading losses). As the Ninth Circuit has explained, a

"litany of alleged false statements, unaccompanied by the pleading of specific facts indicating

why those statements were false, does not meet" the PSLRA's heightened pleading standard.

*Metzler*, 540 F.3d at 1070; *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1198-99 (N.D. Cal.

2008). Put simply, such "fraud by hindsight is not actionable." *Ronconi*, 253 F.3d at 430 n.12

(citation omitted).

For example, Plaintiff claims that PGE's disclosure that it "does not engage in trading

activities for non-retail purposes" was false and misleading (AC ¶¶5, 35, 44, 110, 112, 122, 131;

**Page 11 – DEFENDANTS' MOTION TO DISMISS**

App'x A, Row 1)[5] because PGE engaged in "risky" or "speculative" trading that led to the August 2020 losses. (*Id.* ¶¶80-81; *see also id.* ¶¶5-7, 12, 35 45-46, 86.) But Plaintiff's theory relies on a definition of "non-retail purposes" without "plead[ing] sufficient facts to establish that the actual term used had the distinctive, and false, meaning that Plaintiffs claim." *Tesla*, 985 F.3d at 1194. In *Tesla*, the plaintiffs alleged that Tesla's statement that it "had 'started the installation of Model 3 manufacturing equipment'" was misleading because Tesla had not then "'begun installation of *automated* equipment.'" *Id.* at 1193 (emphasis in original). The Ninth Circuit rejected this argument, emphasizing that the challenged statement did not refer to installation of automated equipment, as plaintiff asserted. The Ninth Circuit further rejected plaintiff's argument that it must "accept as true [the] assertion that installation of 'manufacturing equipment' actually means installation of 'automatic manufacturing equipment,'" reasoning that where "a plaintiff claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest, the plaintiff must plead facts that will support this crucial premise." *Id.*

The *Tesla* decision applies here. Like in *Tesla*, Plaintiff's invented definition of "non-retail purposes" finds no support in PGE's disclosures. Indeed, the AC does not identify a single instance where PGE equates "non-retail" trading with "risky" or "speculative" trading, much less where PGE stated that any of its energy trading was free from risk. Plaintiff simply does not— because it cannot—explain why a trade for retail purposes (*i.e.*, one designed for the benefit of retail customers) could not also carry risk.

Contrary to Plaintiff's flawed theory, PGE explicitly disclosed that it engages in financial derivative energy trading and that the gains and losses from such trading are accounted for

---

[5] Included in DeLuca Declaration With Appendix A to Defendants' Motion to Dismiss.

through the Cost Adjustment Mechanism for the benefit of PGE's retail customers (*supra* §II.C)—and the AC concedes that "*each of these types of trades carried some risk.*" (AC ¶44 (emphasis added).) Indeed, the AC details how financial trading of this kind necessarily entails risk and the potential for profits, as PGE disclosed. (AC ¶¶36-44; *supra* §II.D.)

Accordingly, Plaintiff does not plead any facts (let alone particularized ones) to show that PGE held itself out as conducting a risk-free operation, or that trading for retail purposes meant risk-free or conservative trading. *Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago ex rel. Policemen's Annuity & Benefit Fund of Chicago v. FXCM Inc.*, 333 F. Supp. 3d 338, 348 (S.D.N.Y. 2018) (Defendant's statements "that it was a 'riskless principal' and was 'not exposed to market risk' were not materially misleading when viewed in the context of the document as a whole."), *aff'd,* 767 F. App'x 139 (2d Cir. 2019). And PGE had no legal obligation to further spell out what was self-evident: that energy trading entails risk, whether for retail or non-retail purposes. *See In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (issuers need not "address reasonable investors as if they were children in kindergarten") (citation omitted) (citing cases).

### (b)    PGE's disclosures contradict Plaintiff's claim of falsity.

In addition, the disclosures upon which Plaintiff relies refute its concocted definition of "non-retail purposes." A court must evaluate the alleged false statements "in the context in which they were made, especially in regard to contemporaneous qualifying or clarifying language." *Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017). Thus, a plaintiff must show that a "particular statement, *when read in light of all the information then available* to the market . . . conveyed a false or misleading impression." *Id.* at *5 (emphasis in original) (citation omitted).

Page 13 – DEFENDANTS' MOTION TO DISMISS

Here, as PGE disclosed, its financial derivative trades contribute to prices charged to retail customers because the gains and losses from these trades are designed to be included in the Company's Power Cost forecast and the regulatory Cost Adjustment Mechanism, which PGE and the PUC use to set retail customer prices. (Ex. 3 at 7 (2019 10-K) (Power Cost forecast includes financial contracts); *id.* at 48 (2019 10-K) (settled financial contracts "are recognized as Purchased power and fuel in the statements of income *and included in the [Cost Adjustment Mechanism]*") (emphasis added).) This practice contrasts with PGE's past disclosed activities. For example, in its 2004 annual report, PGE disclosed that it *used to* derive "net gains and losses from PGE's participation in energy trading activities" that were "not reflected in the Company's retail prices." (Ex. 1 at 4 (2004 10-K).) In other words, more than a decade ago, gains and losses from some of PGE's trades did not flow through the regulatory rate-setting process for the benefit of retail customers, but instead flowed only to PGE and its shareholders.[6]

Because PGE's financial trading is designed to be included in the retail rate-setting process and Cost Adjustment Mechanism, Plaintiff has no support for its theory that PGE's trading activity—much less the specific trading that led to the losses at issue—was for "non-retail purposes." *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 2013 WL 2156358, at *8 (N.D. Cal. May 17, 2013) (dismissing claim where allegedly concealed facts were "expressly disclosed").[7]

---

[6] In 2005, the Company disclosed that it had discontinued these trading practices. (*Id.*; Ex. 2 at 3 (2005 10-K).)

[7] As Plaintiff's AC acknowledges, PGE recorded its financial transactions as purchased power and fuel expense. (AC ¶84; Ex. 3 at 68, 84-85 (2019 10-K).) Because these financial derivative trades are designed to benefit customers, Plaintiff's assertion that the trading losses

*(cont'd)*

Moreover, PGE also warned investors that it could be adversely affected by the very events that led to the losses: "extreme weather conditions, constraints to regional transmission facilities, and changes in the power supply in the West." (AC ¶91.) Specifically, PGE's disclosures warned that "weather changes, particularly if coupled with transmission constraints, could adversely impact PGE's cost . . . ." (Ex. 3 at 22 (2019 10-K).) These risks were realized during the unprecedented August heat wave that engulfed the western United States. (AC ¶101.)

### (c)    PGE's decision not to pass the trading losses to customers does not support Plaintiff's theory of falsity.

Despite the above, Plaintiff alleges that the trades at issue must have been for "non-retail" purposes because PGE elected not to pass the trading losses on to customers. (AC ¶¶82-83.) This hindsight-based pleading fails. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F. 3d 970, 988 (9th Cir 1999), *as amended* (Aug. 4, 1999) (superseded on other grounds). The fact that PGE did not ultimately seek regulatory recovery for the trading losses says nothing about whether the trades were designed to be passed through the Cost Adjustment Mechanism for the benefit of retail customers at the time PGE entered them.

Moreover, whether PGE may obtain regulatory recovery hinges on whether the costs were prudently or imprudently incurred—a different analysis than whether the trades were for "retail purposes." (Ex. 3 at 21 (2019 10-K).) The PUC "has significant discretion in the interpretation of this standard" (*id.*), and decides whether it is met based on many factors, including the design, goals, methodologies and targets of the trading strategy; whether the

_____

*(cont'd from previous page)*

were accounted for as purchased power and fuel expense (AC ¶85), even if credited, is of no moment.

**Page 15 – DEFENDANTS' MOTION TO DISMISS**

transactions were executed in a liquid market; and the documentation and analysis of the transactions. (Ex. 11 at 4 (PUC Order 11-432 (Nov. 2, 2011)).)

PGE also has discretion to determine whether to seek recovery for particular trades, including determining whether foregoing recovery may be in its best business interests (*e.g.*, to avoid a negative reaction from customers or the public). (*See* Ex. 3 at 21 (2019 10-K).) Here, PGE's after-the-fact decision not to pass on the cost of its trading losses to customers—trades that PGE forthrightly acknowledged were "ill-conceived" (AC ¶123; Ex. 6 at 38 (8/24/2020 8-K))—does not impugn the veracity of any of the challenged statements at the time they were made. Plaintiff's rank speculation to the contrary is far from the particularized pleading required.[8] *Metzler*, 540 F.3d at 1061.

### (d) Plaintiff's allegation that PGE participates in "wholesale" trading is irrelevant and insufficient to show falsity.

Plaintiff also alleges that PGE derived revenue from "wholesale" energy trading, which it claims evidences trading for "non-retail purposes." (AC ¶¶122-23, 131-32.) This argument is flawed for numerous reasons. For starters, PGE disclosed not only that it derived revenues from wholesale trades, but the precise amount of those revenues over time. (*See* Ex. 3 at 5-6, 10, 41-46 (2019 10-K).) Indeed, Plaintiff's allegations are based on these disclosures. (AC ¶¶30-32, 86-87.) Any suggestion that PGE concealed its wholesale trading therefore lacks merit.

In any event, wholesale revenues are entirely irrelevant under Plaintiff's own theory. The AC affirmatively alleges that PGE's trading losses came from "*financial* transactions, and [were]

---

[8] Plaintiff does not—and cannot—allege that if the trades had generated *gains* rather than losses, then PGE would not have put those gains into the Cost Adjustment Mechanism for the benefit of retail customers.

not . . . related to the physical sale of electricity or natural gas." (*Id.* ¶85 (emphasis added).) Financial transactions comprise trading in the financial derivative instruments at issue. (*Id.* ¶¶37-44.) In contrast, as PGE's disclosures establish, it generates "wholesale revenues" only from the purchase and sale of *physical* power, not from the *financial* transactions at issue here. (*Id.* ¶84.)[9]

In this regard, Plaintiff points to a comment Mr. Lobdell made on a July 31, 2020, earnings call that PGE had increased earnings by five cents based in part on "higher wholesale revenues." (*Id.* ¶86.) Again, however, these wholesale revenues are generated by *physical* power trades, not the *financial* trades that Plaintiff alleges are at the core of this case.[10]

### 2.    Plaintiff fails to plead that PGE's statements about "Balancing Supply" and "Managing Risk" were false.

Plaintiff challenges other statements as supposedly false and misleading, including that (i) PGE's participation in the "wholesale electricity marketplace" was "in order to balance its supply of power to meet the needs of its retail customers" (*id.* ¶¶106, 122); (ii) PGE's sales of electricity were made to "obtain reasonably-priced power for its retail customers" (*id.* ¶¶108, 131); and (iii) PGE engaged in financial derivative trading "to manage exposure to volatility in net power costs for its retail customers" (*id.* ¶110). (*See* App'x A, Rows 2-6.) Plaintiff claims these statements are false because PGE did not engage in these activities to balance supply or manage risk, but rather solely to generate profits. (AC ¶¶107, 109, 111.) These allegations fail.

---

[9]   For the same reason, Plaintiff's allegation that the Company's increase in wholesale energy deliveries somehow evinces "non-retail revenue generation" (AC ¶87) should be disregarded.

[10]   The financial statements about which Mr. Lobdell was speaking reflect an increase in PGE's purchased power and fuel expense (*i.e.*, the accounting for financial derivative trades at issue here), thereby reducing, rather than increasing, PGE's profitability over this period. (*See* Ex. 5 at 52 (2Q 10-Q).) This directly contradicts Plaintiff's alleged theory.

**Page 17 – DEFENDANTS' MOTION TO DISMISS**

The AC does not plead any facts to establish that the Company's trades were solely for "generating profits," much less identify the number or amount of such trades, how Plaintiff determined them to be solely for "generating profits," or how trades for "generating profits" can be distinguished from trades made for PGE's disclosed purposes. *See In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 989-99 (N.D. Cal. 2017) (rejecting allegations of "low quality" contracts unaccompanied by allegations about the number of contracts, what constituted a "low quality" contract, and when the contracts occurred). Plaintiff's theory also ignores that, under the PUC's rate setting processes, gains from energy trading may generate profits while still benefitting PGE's retail customers because they are designed to flow through the Cost Adjustment Mechanism, as described above. (*Supra* §II.C.)

Further, Plaintiff points to PGE's disclosure that the trading losses were caused in part by "constraints to regional transmission facilities," and infers that the trades were thus not "performed to hedge the risk of price fluctuations for [PGE's] retail customers, and thus were for 'non-retail purposes.'" (AC ¶101.) But Plaintiff pleads no facts to explain how or why the existence of "constraints to regional transmission facilities" shows that any of PGE's trades were not designed as hedges or otherwise for price risk management purposes. Other than Plaintiff's own say-so, the AC offers no explanation for why PGE's trading was for "non-retail purposes." And again, PGE expressly disclosed transmission constraints as a risk factor. (*Supra* §II.D.)

### 3.    Plaintiff fails to plead that earnings-related statements were misleading.

Plaintiff also alleges that PGE's statements regarding its earnings and corporate strategy were misleading because PGE omitted that speculative energy trading drove its earnings. (*See* AC ¶¶116, 118, 120, 124, 126, 128, 133; App'x A, Rows 7-14.) The Ninth Circuit "has consistently held that the PSLRA's falsity requirement is not satisfied by conclusory allegations

**Page 18 – DEFENDANTS' MOTION TO DISMISS**

that a company's class period statement regarding its financial well-being are *per se* false based

on the plaintiff's allegations of fraud generally." *Metzler*, 540 F.3d at 1070. Thus, "'[a]ccurate

statements of past performance' are not actionable as a matter of law." *Melot v. JAKKS Pac.,

Inc.*, 2014 WL 12589334, at *10 (C.D. Cal. June 6, 2014); *see also W. Pa. Elec. Emps. Pension

Fund v. Mentor Graphics Corp.*, 2017 WL 3668957, at *30 (D. Or. June 2, 2017) (Papak, M.J.)

(statements regarding the company's revenue and growth "constitute accurate and non-

misleading statements of contemporaneous or historical fact").

 Here, Plaintiff does not allege that PGE misstated its actual earnings or financial results.

Such accurate statements of financial performance cannot serve as the basis for any claim,

regardless of Plaintiff's assertion that "speculative" or "non-retail" trading contributed to the

results or could affect results in the future. *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231,

1245 (N.D. Cal. 1998) ("Disclosure of accurate historical data does not become misleading even

if less favorable results might be predictable by the company in the future."); *Mandalevy v. Bofl

Holding, Inc.*, 2018 WL 3032588, at *7 (S.D. Cal. June 19, 2018) ("Plaintiffs offer no reason to

believe that the contents of [the issuer's] financial and operating results gave the impression that

it was not lending to criminals" from which it "derived" earnings); *In re Intrexon Corp. Sec.

Litig.*, 2017 WL 732952, at *5 (N.D. Cal. Feb. 24, 2017) ("That [the issuer] did not disclose the

specific source of each revenue dollar in order to dispel Plaintiff's theory of liability does not

render its lawful and accurate revenue disclosures deceptive."). Further, Plaintiff fails to allege

why the Company's stated reasons, such as demand from "high-tech and digital services" and

"lower power costs and operating expenses" (AC ¶128), did not actually contribute to earnings

growth. *See Metzler*, 540 F.3d at 1070 (conclusory allegations insufficient).

**Page 19 – DEFENDANTS' MOTION TO DISMISS**

4.      **Plaintiff fails to plead that PGE's general statements regarding cost, risk, and strategy were false.**

Plaintiff also challenges PGE's general statements about cost, risk, and strategy that are not actionable as a matter of law. First, Plaintiff challenges PGE's statement that for its Integrated Resource Plan ("IRP") it "take[s] the least cost, least risk proposals that come our way." (AC ¶118.) Taken in context, however, this statement was not even about energy trading—it was a response to an analyst's question about investment opportunities related to the IRP, which sets forth PGE's long-term plan for obtaining energy. *See* ORS 860-027-0400; (Ex. 9 at 4 (PUC Order 20-152) (PGE's IRP uses a 30-year planning horizon)); *see also ChinaCache*, 2017 WL 114401, at *5 (courts evaluate "alleged false statements in the context in which they were made").[11]

Likewise, Plaintiff critiques a comment that PGE's "long-term strategy has not changed" on the ground that the Company was engaging in energy trading for non-retail purposes. As the AC concedes, this comment refers to the impact of the COVID-19 pandemic, not energy trading. (AC ¶126.) This comment was a response to an analyst's question about the impact of the pandemic, explaining that "long-term strategy has not changed"; customers remain "as focused on decarbonizing as they were before the pandemic"; and "we really see through this period of time[,] the ability to . . . emerge stronger and lower cost after the pandemic." (*Id.*) Accordingly, it

---

[11]  In any event, this kind of statement is immaterial as a matter of law. *See Short v. Dondanville*, 2012 WL 12888360, at *9 (C.D. Cal. Oct. 5, 2012) ("generalized" statement that "[w]e seek to reduce our risk of loss through our underwriting and monitoring procedures" was "non-actionable puffery"); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1135 (S.D. Cal. 2012) (statement that "[w]e're also in a unique position to leverage our production capacity to reduce costs" was "immaterial" (citation omitted)), *aff'd sub nom. Fresno Cty. Emps. Ret Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015).

cannot form the basis of a cognizable claim. *See ChinaCache*, 2017 WL 114401, at *5.

**5.    Plaintiff fails to plead that Sarbanes-Oxley certifications were false.**

Plaintiff claims that the Individual Defendants' certifications pursuant to the Sarbanes-Oxley Act of 2002 were false because the annual report contained alleged misstatements and omissions. (AC ¶¶104-05; 114-15; App'x A, Rows 15-16.) "[S]tandard Sarbanes–Oxley certifications, standing alone, are insufficient to show a 10(b) violation" because "the failure to detect fraud does not itself render false standard certifications about the adequacy of internal controls." *Bruce v. Suntech Power Holdings Co.*, 2013 WL 6843610, at *4, *9 (N.D. Cal. Dec. 26, 2013); *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1091 (C.D. Cal. 2008) ("[T]he SOX certifications are false only to the extent that the [other challenged] statements within the Form 10–Q are false, so the Court need not consider the SOX certifications separately.").

Even if Plaintiff had adequately pled that PGE's failure to detect fraud resulted in the trading losses—which it has not—the SOX certifications are about controls over disclosure and financial reporting, not oversight of trading strategies. (*See* AC ¶¶104-05, 114.) Indeed, even a defendant's "admission of a material weakness in [its] internal controls does not contradict the prior statement certifying [its] disclosure controls." *In re Dothill Sys. Corp., Sec. Litig.*, 2009 WL 734296, at *6 (S.D. Cal. Mar. 18, 2009).

**6.    Plaintiff's general allegations of mismanagement are insufficient.**

Plaintiff's few remaining allegations—that PGE engaged in trading that was not "normal" for the industry; "turned to risky, speculative trades in energy derivatives to enhance its bottom line and maintain its streak of increasing profits"; "engaged in high-risk trad[es]" to "generate profits for the Company"; "abandoned its risk-averse profile in pursuit of short-term profits

**Page 21 – DEFENDANTS' MOTION TO DISMISS**

through speculative trading activities" (AC ¶¶3-4, 6)—are also not actionable.

As the Supreme Court has explained, the federal securities laws regulate disclosure, and "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462, 479 (1977) (citation omitted). Setting aside that Plaintiff fails to allege adequate facts to support its allegations, even if credited, they amount to nothing more than hindsight criticisms of the wisdom of PGE's alleged business decisions. This cannot state a claim for fraud. *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 955 (9th Cir. 2017) ("Federal securities laws do not protect investors from quality control problems, service lapses, or management miscues."); *Kaplan v. Charlier*, 426 F. App'x 547, 549 (9th Cir. 2011).

**B.    The AC fails to allege a strong inference of scienter as to each Defendant.**

Plaintiff's claims also fail because the AC does not allege that any Defendant acted with scienter—an intent to defraud. A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with" "no less than a degree of recklessness that strongly suggests actual intent." *Glazer Cap. Mgmt., L.P. v. Magistri*, 549 F.3d 736, 742-43 (9th Cir. 2008) (citation omitted). As the Supreme Court explained, "[a] complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 310 (2007). To impute scienter to PGE, Plaintiff must first plead the scienter of the Individual Defendants. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).

**1.    Plaintiff's scienter allegations as to the Individual Defendants are insufficient.**

To raise a strong inference of scienter, Plaintiff must (i) allege "*specific information*

conveyed to management and related to the fraud," *Metzler*, 540 F.3d at 1068 (emphasis added); or (ii) show that this is among the "rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (citation omitted). The AC does not satisfy either of these stringent standards.

> **(a)    Plaintiff does not allege that the Individual Defendants had specific information contrary to the challenged disclosures.**

First, the AC lacks any factual allegations—let alone particularized facts—showing that Ms. Pope or Mr. Lobdell had specific information contradicting PGE's statements during the Class Period. *See Metzler*, 540 F.3d at 1068. A plaintiff must produce either "specific admissions by . . . corporate executives of detailed involvement in the minutia of a company's operations, such as data monitoring, or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive*, 759 F.3d at 1062. Courts "repeatedly reject[] vague allegations of access to unspecified information." *Mahapatra v. Truecar, Inc.*, 2015 WL 12552062, at *2 (C.D. Cal. Dec. 9, 2015).

Here, the AC does not allege a single internal report, document, or communication through which the Individual Defendants were aware of the specific trading activity at issue in this case. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (no scienter where plaintiffs did not "identify any internal reports of 'sales data,' much less plead, in any detail, the contents of any such report" (citation omitted)). And even if Plaintiff had done so, the AC does not plead any facts to demonstrate that the Individual Defendants understood the Company's trading activities to have contradicted PGE's disclosures at the time they were made. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009) (access to quarterly accounting numbers does not mean "management was in a position to know that such data was

Page 23 – **DEFENDANTS' MOTION TO DISMISS**

being manipulated"); *see FXCM*, 333 F. Supp. 3d at 351 ("Plaintiff must allege [defendant] perceived the risk as a serious possibility at the time, not merely in hindsight.").

Rather than plead such facts, Plaintiff essentially claims that the Individual Defendants *must have* known that PGE's statements were false by virtue of their positions. (*See, e.g.*, AC ¶¶143, 146.) Courts routinely reject such position-based pleading as insufficient. *Metzler*, 540 F.3d at 1068; *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000) (allegations that corporate "officers had the requisite knowledge by virtue of their 'hands on' position . . . would eliminate the necessity for specially pleading scienter"). Indeed, the Ninth Circuit "has noted on more than one occasion [that] corporate management's general awareness of the day-to-day workings of the company's business," standing alone, "does not establish scienter." *Metzler*, 540 F.3d at 1068 (citing cases).

In addition to merely pleading the Individual Defendants' positions, Plaintiff offers only generalized allegations about their management style, including that Ms. Pope is a "hands on" manager who was "detail oriented" and "focused on how PGE's 'business was being conducted.'" (AC ¶¶90, 141.) Such assertions do not pass muster under the PSLRA. *See Intuitive*, 759 F.3d at 1056 (rejecting allegations of "top-down" management with defendants "playing very active roles in running the day-to-day operations"); *Glazer*, 549 F.3d at 746 ("[G]eneral allegations of defendants' 'hands-on' management style . . . are insufficient to create a strong inference of scienter." (citation omitted)).

Furthermore, Plaintiff alleges that Ms. Pope must have had knowledge of misstatements because the "Energy Trading Risk Management Unit" reported to her. (AC ¶138.) Not only are such allegations insufficient to satisfy scienter, *see Metzler*, 540 F.3d at 1068 ("[G]eneral awareness of the day-to-day workings of the company's business does not establish scienter."),

**Page 24 – DEFENDANTS' MOTION TO DISMISS**

but Plaintiff also ignores that this line of reporting began only *after* the trading losses were disclosed. (*See* Ex. 6 at 38-39 (8/24/2020 8-K) (explaining changes to risk management reporting).) By definition then, this simply cannot raise any inference as to Ms. Pope's knowledge. *See Nietzche v. Freedom Home Mortg. Corp.*, 2019 WL 5057174, at *3 (D. Or. Oct. 8, 2019) (Simon, J.) ("[T]he Court is 'not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint.'" (citation omitted)), *appeal docketed*, No. 19-35876 (9th Cir. Oct. 17, 2019).

In yet another variation of the same position-based theme, Plaintiff alleges that long before the Class Period commenced, Ms. Pope served as PGE's Senior Vice President, Power Supply, Operations and Resource Strategy, and Mr. Lobdell served in leadership roles in the Power Operations group. (AC ¶¶16, 17, 140.) Again, such allegations based solely on an individual's position do not, and cannot, support a strong inference of fraud. *Metzler*, 540 F.3d at 1068. This conclusion applies with even greater force here, where the Individual Defendants did not even hold these positions during the relevant time period.

Plaintiff's allegation that Ms. Pope's and Mr. Lobdell's Sarbanes-Oxley Act certifications give rise to an inference of scienter (AC ¶¶142, 147) is also without merit. Sarbanes-Oxley certifications are not sufficient to raise a strong inference of scienter and "do not make . . . otherwise insufficient allegations more compelling by their presence in the same complaint." *Zucco*, 552 F.3d at 1004 (quoting *Glazer*, 549 F.3d at 747-48). Indeed, to hold otherwise "would 'eviscerat[e] the pleading requirements for scienter set forth in the PSLRA.'" *Id.* (citation omitted).

At base, the AC fails to allege any particularized facts that either Individual Defendant knew of any specific energy trading strategies, transactions, or activities that led to the losses, let

**Page 25 – DEFENDANTS' MOTION TO DISMISS**

alone that such activities rendered PGE's public statements false when they were made. *See Zucco*, 552 F.3d at 1000-01. This flaw permeates the AC and requires dismissal.

> **(b)    Plaintiff's allegations regarding the Individual Defendants' compensation are insufficient.**

Plaintiff also alleges that the decision of the Compensation Committee not to award incentive compensation to Ms. Pope or Mr. Lobdell for 2020 shows that the committee believed that wrongdoing occurred, thereby establishing their scienter. (AC ¶¶139, 145.) But the AC does not—because it cannot—allege that the committee's decision was based on any finding of wrongdoing. To the contrary, the AC acknowledges that the committee made its decision based on the Company's "third quarter losses," reasoning that "it would be inconsistent with PGE's pay-for-performance philosophy for certain senior leaders to receive annual incentive compensation." (*Id.* ¶100.) Thus, the committee's decision did not reflect a conclusion that either Individual Defendant engaged in wrongdoing, let alone fraud. As the AC concedes, the decision simply reflected the reality of PGE's financial performance for the quarter. *See Christian v. BT Grp. PLC*, 2020 WL 1969941, at *8 (D.N.J. Apr. 24, 2020) ("[R]eduction of the pay of executives to reflect actual performance does not give rise to a compelling inference of scienter" where "[n]o facts are pled to suggest that the reduction in pay was due to their participation in any fraud."), *appeal docketed sub nom. PAMCAH-AU Loc. 675 Pension FU v. BT Group PLC*, No. 20-2106 (3d. Cir. June 2, 2020); *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 398 (D. Del. 2010) ("[T]here are no facts to support plaintiff's conclusion that this lack of compensation was due to . . . alleged conspiracy."), *aff'd*, 442 F. App'x 672 (3d Cir. 2011).

> **(c)    Plaintiff's allegations regarding Mr. Lobdell's retirement are insufficient.**

Plaintiff also implies that Mr. Lobdell's retirement is evidence of fraudulent intent (AC

**Page 26 – DEFENDANTS' MOTION TO DISMISS**

¶¶10, 17), but this too does not raise an inference of scienter. Plaintiff must plead facts that the retirement "was uncharacteristic when compared to [PGE's] typical hiring and termination patterns or was accompanied by suspicious circumstances[.]" *Zucco*, 552 F.3d at 1002. Absent such allegations, "the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Id.*

Here, the AC does not contain any facts to establish that the timing of Mr. Lobdell's resignation was suspicious. Without such facts, it cannot give rise to an inference of fraud. *Mallen*, 861 F. Supp. at 1111 (S.D. Cal. 2012) (CFO's resignation two months after the alleged "corrective announcement, without any other facts about the resignation, does not support a strong inference of scienter.").[12]

### (d)    Plaintiff cannot rely on the "core operations" doctrine.

Plaintiff similarly cannot establish that this is the "'rare circumstance' in which it would be 'absurd' to suggest that management was without knowledge" that a corporate defendant's statements were allegedly misleading. *Intuitive*, 759 F.3d at 1063. Such circumstances arise only when "the information misrepresented is readily apparent" because it concerns "prominent facts" that are "obvious from the operations of the company." *Zucco*, 552 F.3d at 1001. Thus, courts

---

[12]  To the contrary, Mr. Lobdell is 62 years old and served at PGE for 36 years. (Ex. 3 at 19 (2019 10-K); Ex. 8 (10/29/2020 announcement).) As such, the far more compelling inference is that his retirement had nothing to do with any alleged securities fraud. *See Feola v. Cameron*, 2015 WL 12644566 (C.D. Cal. Nov. 24, 2015) (retirement "after having worked with [the company] for more than 30 years . . . show[ed] that an inference of suspicious circumstances is unwarranted").

**Page 27 – DEFENDANTS' MOTION TO DISMISS**

applying this so-called "core operations" doctrine have generally "required that the operation in question constitute nearly all of a company's business before finding scienter." *Okla. Firefighters Pension & Ret. Sys. v. Ixia*, 2015 WL 1775221, at *30 (C.D. Cal. Apr. 14, 2015) (citation omitted).

Here, Plaintiff makes no attempt to identify any "prominent facts" that would be "obvious" to the Individual Defendants, or to explain how those facts would obviously demonstrate that PGE's statements were misleading when made. Nor does Plaintiff allege the proportion of PGE's business attributable to the purported trading activities upon which it bases its claims. At best, the AC alleges that wholesale electricity trading is "integrally important to the Company's success." (AC ¶149.) Such generalized allegations are insufficient. *Iron Workers Loc. 580 Joint Funds v. NVIDIA Corp.*, 2021 WL 796336, at *12 (N.D. Cal Mar. 2, 2021) ("alleged importance of China's market" is insufficient to support the core operations inference). Accordingly, Plaintiff cannot satisfy the pleading requirement for the core operations doctrine.

## 2.    Plaintiff's confidential witness allegations fail to establish scienter.

Plaintiff's reliance on four "confidential witnesses" adds nothing to scienter. "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* Plaintiff's confidential witnesses do not clear either hurdle.

First, Plaintiff has not alleged that any confidential witness had "personal knowledge" of

**Page 28 – DEFENDANTS' MOTION TO DISMISS**

any alleged misconduct, as it must. *Id.* at 996. To establish the requisite personal knowledge, the

plaintiff must allege particularized facts to show that the witnesses were "positioned to know the

information alleged." *Id.* Plaintiff alleges no facts whatsoever regarding the job responsibilities

of any confidential witness, let alone allegations showing their access to information concerning

PGE's trading operations. None of the witnesses claim to have been a trader, supervised traders,

or to have overseen the disclosure function related to energy trading. (AC ¶¶23-26); *see NVIDIA*,

768 F.3d at 1061 (confidential witness's "experiences do not contribute to an inference of

scienter" where they "worked in an area unrelated to [the relevant department]"); *Nozak v. N.*

*Dynasty Minerals Ltd.*, 804 F. App'x 732, 734 (9th Cir. 2020) (rejecting confidential witness

statements where "Plaintiffs provide little to no detail regarding the positions the sources held").

Equally problematic, all four witnesses are "by the complaint's own account, several levels

removed from the company's executive team," *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d

151, 162 (1st Cir. 2019), which further undermines Plaintiff's allegations.[13]

Second, the confidential witnesses make only "conclusory assertions of scienter," which

are also insufficient at the pleading stage. *Zucco*, 552 F.3d at 996. For example, Plaintiff offers

the opinion of CW2 that "the Company was assuming increasing risks through its energy trades."

(AC ¶77.) That opinion cannot support a cogent scienter theory because the AC does not claim

that CW2 ever communicated that opinion to anyone, much less to the Individual Defendants, or

---

[13]  Plaintiff concedes that CW2 was not employed at PGE during the Class Period and
that CW1 left PGE months before the close of the Class Period. (AC ¶¶23-24, 159.) Thus,
neither was in a position to know the purpose or nature of the trades at issue in this action. Courts
routinely reject allegations from confidential witnesses who were not employed with the
company during the class period. *See, e.g.*, *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th
Cir. 2020).

**Page 29 – DEFENDANTS' MOTION TO DISMISS**

explain how an opinion about purportedly increasing risk revealed the falsity of any PGE disclosure to either Individual Defendant. *See Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201, 1206 (D. Or. 2006) (Brown, J.) (opinions do not support scienter if they are based on hearsay, rumor, or speculation), *aff'd,* 552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Moreover, vague observations that energy traders were "cocky" and "trying to meet their annual revenue goals," and that "traders knew that Pope wanted 'big returns' on their trades" (AC ¶77)—untethered to any specific facts or details about specific energy trading, including the trading that led to the losses at issue—are insufficient to establish that Defendants committed securities fraud. *See Zucco*, 552 F.3d at 998 ("None of these confidential witness statements establishes the witnesses' personal knowledge or reliability by recounting the particulars of the alleged transgressions."); *Endologix*, 962 F.3d at 416 (rejecting CW statements that were "high on alarming adjectives," but "short on the facts"); *NVIDIA*, 2021 WL 796336, at *9 (CW allegations failed to show that defendant possessed "contradictory information when he made any challenged statement").

Furthermore, the confidential witness statements consist almost entirely of "unreliable hearsay." *Zucco*, 552 F.3d at 996. Plaintiff alleges that "CW3 was told by her direct boss that a senior executive, most likely Pope, had told PGE's board of directors that they would 'find $60 million in profit' or revenue." (AC ¶79.) CW3 does not claim to know whether Ms. Pope made the statement at issue. *See NVIDIA*, 768 F.3d at 1064 (rejecting confidential witness allegation where, "[f]rom this statement, it is evident that CW1 does not actually know whom . . . his/her boss communicated with").

Similarly, Plaintiff alleges that CW3 stated that "at one point after Pope assumed the helm, she was asked to 'monetize the trading floor.'" (AC ¶79.) However, Plaintiff does not

**Page 30 – DEFENDANTS' MOTION TO DISMISS**

allege who asked CW3 to monetize the trading floor, what was meant by that statement, or how that directive has anything to do with the challenged disclosures or alleged trading losses. Plaintiff does not even attempt to attribute the directive to Ms. Pope or Mr. Lobdell. In fact, CW3 admits that when she said it was not possible to monetize the trading floor, "the request was not made of her again." (*Id.*)

Finally, Plaintiff alleges that, according to CW4, Ms. Pope stated at an "all-hands meeting" in late August 2020 that two traders had participated in "'risky' transactions." (AC ¶89.) This allegation recounts a statement allegedly made *after* the Class Period; it cannot evidence knowledge she had *during* the Class Period. *See NVIDIA*, 768 F.3d at 1059–60 (articles published after the alleged corrective disclosure were made with the benefit of hindsight and do not reflect defendants' contemporaneous knowledge). In any event, the witness does not purport to explain what "risky" meant in that context, much less establish that PGE's trading activities were inconsistent with its public disclosures.

Finally, Plaintiff alleges that "CW2 explained that traders were told to adhere to certain limits for trades and were required to get approval . . . if they exceeded those limits." (AC ¶78.) But this simply highlights that PGE had established trading limits—not that such trades were encouraged. While Plaintiff alleges that "CW2 stated that this policy was not always followed" (*id.* ¶78), it does not allege how often the policy was not followed or in what ways, or who, if anyone, among senior management *knew* that policies were supposedly not always followed. *See NVIDIA*, 768 F.3d at 1064.[14] Plaintiff, therefore, fails to plead scienter based on any confidential

---

[14]  Even if Plaintiff had alleged that the trades were in violation of some PGE policy (and it has not), the most compelling inference is that this information would be kept from the

*(cont'd)*

witness allegation.

### 3.    Plaintiff does not plead any cogent motive to commit fraud.

The AC also fails to plead any cognizable motive for Defendants to commit securities fraud, which seriously undermines scienter. *See In re Tibco Software, Inc. Sec. Litig.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) (rejecting scienter allegations when plaintiff had "not even shown that [d]efendants were motivated to commit fraud"). Plaintiff does not allege that Ms. Pope or Mr. Lobdell sought to sell a single share of PGE stock at inflated prices or otherwise personally benefitted from the alleged scheme. Even "a strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal." *In re Downey Sec. Litig.*, 2009 WL 2767670, at *13 (C.D. Cal. Aug. 21, 2009); *see also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012) (concluding that absence of stock sales was inconsistent with the plaintiff's theory of financial motive).

Plaintiff alleges that Ms. Pope "looked for alternative and nontraditional ways to generate revenues" (AC ¶141) and encouraged employees to employ "creative means" to grow profits (AC ¶79). But every company executive seeks to maximize revenue and grow profits, which is why such allegations are insufficient to establish a motive to commit fraud. *See Rigel*, 697 F.3d at 884 ("[A]llegations of routine corporate objectives . . . are not, without more, sufficient to allege scienter.").

If the Individual Defendants knew about or had foreseen massive trading losses, one

_____

*(cont'd from previous page)*

Individual Defendants, not advertised to them. *Glazer*, 549 F.3d at 747 (surreptitious nature of foreign payments created the "equally strong inference that the payments would have deliberately been kept secret—even within the company").

**Page 32 – DEFENDANTS' MOTION TO DISMISS**

would expect them to either direct the Power Operations group to eliminate such trades or to sell their own stock in advance of the impending losses. Yet, Plaintiff does not allege that they took any such steps. Such failure undermines scienter. *Westchester Teamsters Pension Fund & Teamsters Loc. 456 Annuity Funds v. UBS AG*, 604 F. App'x 5, 7-8 (2d Cir. 2015) ("Plaintiffs have offered no plausible explanation as to why Defendants would turn a blind eye to the possibility that unauthorized trading was exposing [the issuer] to billions of losses."); *Endologix*, 962 F.3d at 408 ("[P]laintiff's core theory . . . has no basis in logic or common experience.").

### 4.    Plaintiff's allegations support a more compelling inference of non-fraud.

Finally, Plaintiff's proposed inference of fraudulent intent is belied by the more compelling *non*-culpable inference. *See Tellabs*, 551 U.S. at 324. Plaintiff concedes, as it must, that after PGE suffered the trading losses at issue, it promptly disclosed the losses (AC ¶91), and "created a special committee of the Board of Directors . . . to review the Company's energy trading practices and its controls related to the trading, with the assistance of external advisors." (AC ¶9.) The strong inference to be drawn from these facts is that Defendants were attempting to comply with all rules and regulations and acted quickly to remedy the situation once problems arose. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("Ordering an investigation . . . was 'a prudent course of action that weakens . . . an inference of scienter.'"); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016) (citation omitted); *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at *13 (S.D.N.Y. June 20, 2016) ("[T]he more compelling inference is that Defendants were reacting to an uncertain and rapidly changing environment and attempting to understand the implications.").

Plaintiff also concedes that PGE had taken a conservative approach to trading during the Individual Defendants' previous tenures in the Power Operations group. (*See* AC ¶¶2, 16-17.)

**Page 33 – DEFENDANTS' MOTION TO DISMISS**

If anything, these allegations give rise to a more compelling inference that Ms. Pope and Mr. Lobdell believed PGE's trading function was also operating conservatively during the Class Period, and that when certain trading led to unexpected losses, Defendants acted swiftly to investigate the facts and take any remedial measures necessary. *See Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714, 717 (9th Cir. 2010) (scienter allegations insufficient where inference was "less compelling than a competing inference of non-fraudulent intent").

Ultimately, Plaintiff's theory of fraud rests on its bare conclusion—made with the benefit of hindsight—that because PGE suffered certain trading losses, Defendants must have intended to defraud the market. But the AC pleads no facts to support any cogent theory for why Defendants would engage in fraud, much less any allegations that undercut the more cogent, non-culpable explanation for PGE's conduct. *See In re LifeLock, Inc. Sec. Litig.*, 690 F. App'x 947, 955 (9th Cir. 2017) ("Federal securities laws do not protect investors from quality control problems, service lapses, or management miscues.").

**C.     Plaintiff does not plead loss causation.**

The AC also fails to plead loss causation as it must. To do so, Plaintiff must "allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). Thus, Plaintiff must identify a corrective disclosure that "revealed [the fraud] to the market and caused the resulting losses." *Metzler*, 540 F.3d at 1063. Simply revealing a loss alone is not enough.

Plaintiff does not satisfy this standard. The AC alleges only one purported loss causation event—PGE's announcement of trading losses on August 24, 2020. (AC ¶¶91-97.) Plaintiff alleges that the announcement revealed that PGE "had been conducting speculative and risky

**Page 34 – DEFENDANTS' MOTION TO DISMISS**

trades in the hope of generating revenue and profit, and not just to hedge against price fluctuations." (AC ¶7.) But the press release does not say anything about speculative trading or speak to the purpose of the trades. *See Metzler*, 540 F.3d at 1063 (no loss causation where the alleged corrective disclosures did not "disclose[]" the "fraudulent activity that [plaintiff] contends forced down the stock that caused its losses"); *In re Shoretel Inc. Sec. Litig.*, 2009 WL 248326, at *5 (N.D. Cal. Feb. 2, 2009) (dismissing where alleged corrective disclosure "reveals nothing about what was allegedly misrepresented" but instead shows "that the market reacted to defendant's poor financial health"). Nor do any of the analyst reports on which Plaintiff relies express concern about "speculative" trading or trading for "non-retail" purposes. (AC ¶¶94-97.) *See In re Verifone Sec. Litig.*, 2016 WL 1213666, at *9 (N.D. Cal. Mar. 29, 2016) (analyst report was "a critique of poor performance" but did not "show that Defendants engaged in fraudulent misconduct"). Thus, Plaintiff does not plead that the stock price reaction was due to any revelation of fraud, as opposed to the mere trading losses themselves. *See Roofers Loc. No. 149 Pension Fund v. DreamWorks Animation SKG, Inc.*, 677 F. App'x 376, 377 (9th Cir. 2017) ("Plaintiff does not adequately allege that the write-down and resulting stock decline resulted from a revelation of fraud, rather than from investors' disappointment" about "the earnings miss.").

Plaintiff's loss causation theory fails for another reason. It is well established that if a risk is known to the market before the alleged corrective disclosure, the purported corrective disclosure cannot establish loss causation. *See Melot v. JAKKS Pac., Inc.*, 2016 WL 6902093, at *26 (C.D. Cal. Nov. 18, 2016). The AC alleges that PGE's annual report filed on February 14, 2020, revealed that the Company traded for "non-retail revenue generation" (AC ¶87), and that on the July 31, 2020, earnings call Mr. Lobdell attributed an increase in PGE's earnings to "non-

**Page 35 – DEFENDANTS' MOTION TO DISMISS**

retail energy trading," (AC ¶86). Plaintiff mischaracterizes these disclosures, but even accepting these allegations as true, both statements occurred before the supposed August 24, 2020, "corrective disclosure." Plaintiff therefore concedes that PGE revealed to the market in February and July 2020 that it was engaged in non-retail trading (as Plaintiff defines it), destroying its theory that the August 2020 disclosure "corrected" the market and led to its purported losses. This defeats any claim of loss causation.

## IV.    PLAINTIFF DOES NOT STATE A CLAIM UNDER SECTION 20(A) OF THE EXCHANGE ACT

To establish "control person liability" under Section 20(a), a plaintiff must allege with particularity a primary violation and control. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1033 n.8, 1035 n.15 (9th Cir. 2002). Because the AC does not state a claim under Section 10(b), Plaintiff's claim under section 20(a) must also be dismissed.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court dismiss the AC in its entirety with prejudice.[15]

---

[15]  Given the myriad deficiencies in the AC that cannot be rectified, Defendants respectfully submit that the AC should be dismissed with prejudice.

Dated this 12th day of March, 2021.

MARKOWITZ HERBOLD PC

By:     *s/Dallas DeLuca*
        David B. Markowitz, OSB #742046
        DavidMarkowitz@MarkowitzHerbold.com
        Dallas DeLuca, OSB #072992
        DallasDeluca@MarkowitzHerbold.com
        Stanton R. Gallegos, OSB #160091
        StantonGallegos@MarkowitzHerbold.com

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP

        Susan L. Saltzstein (*admitted pro hac vice*)
        Alexander C. Drylewski (*admitted pro hac vice*)
        Shaud G. Tavakoli (*admitted pro hac vice*)
        One Manhattan West
        New York, New York 10001
        susan.saltzstein@skadden.com
        alexander.drylewski@skadden.com
        shaud.tavakoli@skadden.com
        Tel: 212-735-3000

        Peter B. Morrison (*admitted pro hac vice*)
        Virginia Milstead (*admitted pro hac vice*)
        300 S Grand Avenue Suite 3400
        Los Angeles, California 90071
        peter.morrison@skadden.com
        virginia.milstead@skadden.com
        Tel: 213-687-5000

        *Attorneys for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b), because it contains 10,917 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of authorities, signature block, and any certificates of counsel.

Dated this 12th day of March, 2021.

MARKOWITZ HERBOLD PC

By:    *s/Dallas DeLuca*
      Dallas DeLuca, OSB #072992
      DallasDeluca@MarkowitzHerbold.com
      *Of Attorneys for Defendants*

**Page 38 – DEFENDANTS' MOTION TO DISMISS**